CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

DEC 0 5 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| T. MICHAEL SCOTT, | ) | |
| | ) | |
| SUFFERN ASSOCIATES, LLC, | ) | |
| | ) | Civil Action No. 7:08CV00515 |
| CATHERINE C. DAVIS, | ) | |
| | ) | |
| and | ) | |
| | ) | **MEMORANDUM OPINION** |
| MICHAEL D. DAVIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | By:     Hon. Glen E. Conrad |
| v. | ) | United States District Judge |
| | ) | |
| BRANCH BANKING AND TRUST CO., | ) | |
| successor by merger to BRANCH BANKING | ) | |
| AND TRUST COMPANY OF VIRGINIA, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiffs, T. Michael Scott ("Scott"), Catherine C. Davis ("Mrs. Davis"), and

Michael D. Davis ("Mr. Davis"), and Suffern Associates, LLC ("Suffern") filed this diversity

action asserting that the defendant, Branch Banking and Trust Co. ("BB&T"), breached the terms

of an escrow agreement to which the plaintiffs are parties. This matter is before the court on the

defendant's motion to dismiss. For the reasons set forth below, the motion will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts, which are taken from the plaintiffs' complaint, are accepted as true

for purposes of the defendant's motion to dismiss. See Estate Constr. Co. v. Miller & Smith

Holding Co., 14 F.3d 213, 217-218 (4th Cir. 1994).

Individual plaintiffs Scott, Mrs. Davis, and Mr. Davis are residents of the Commonwealth

of Virginia. Plaintiff Suffern is a Virginia limited liability company with a principal place of business in Florida. Defendant BB&T is a North Carolina corporation. In February of 2006, the plaintiffs decided to invest in Resource Pointe Partners, LLC ("RPP"), a Virginia limited liability company organized for the purpose of owning membership interests in and serving as a member of Bridgewater Pointe Partners, LLC ("BPP"). BPP has the stated purpose of acquiring, owning, holding, operating, developing and otherwise dealing with certain waterfront property located in Franklin County, Virginia known as the Bridgewater Pointe Property.

Scott executed a Subscription Agreement with RPP on February 10, 2006 and simultaneously invested $500,000 paid by wire transfer. Suffern executed a Subscription Agreement with RPP on February 15, 2006 and simultaneously invested $200,000 paid by wire transfer. Mr. and Mrs. Davis executed a Subscription Agreement in February 2006 and also invested $50,000 paid by wire transfer. All of the plaintiffs' Subscription Agreements were accepted by RPP on March 31, 2006.

The Subscription Agreements signed by the plaintiffs provide, in relevant part, as follows:

> This Subscription Agreement is made by and between Resource Pointe Partners, LLC, a Virginia limited liability company (the "Company"), and the undersigned person (the "Principal") who is subscribing hereby for a Class A Membership Interest in the Company pursuant to the Investment Guide ("Guide") dated February 8, 2006 and the attachments thereto including the draft Operating Agreement of the Company ("Operating Agreement") (collectively, the "Investment Documents").
>
> . . .
>
> I.     Subscription.
>
>        A.     The Principal hereby subscribes for the Class A Membership

2

Interest (the "Units") in the Company in the amount set forth on the signature page below, at a price of $100,000 per Unit.[1] Simultaneously with the execution of this Subscription Agreement, the Principal is delivering the amount set forth on the signature page below by wire transfer as instructed by the Company. The funds submitted herewith shall be placed in escrow at a commercial bank. If this subscription is accepted, such funds, including any interest thereon, shall be released to the Company and the Principal will be admitted to the Company following acceptance by the Managers of the Company (the "Manager") of subscriptions for at least 15 Units or at a later date determined by the Company in the event the Company elects to have staged closings. The Principal understands that the Offering will terminate on February 28, 2006 (which date may be extended in the discretion of the Manager to a date not later than June 30, 2006). If this subscription is not accepted, or if subscriptions for at least 15 Units have not been accepted by February 28, 2006 (as such date may be extended), the funds submitted herewith plus any interest thereon shall be returned to the Principal.

The Subscription Agreements further provide that they shall be governed by the laws of the Commonwealth of Virginia.

The Investment Guide is dated February 8, 2006. That document provides that RPP owned a 50% membership interest in BPP and that up to 20 Class A Units of membership would be offered at a price of $125,000 each. With regard to the return of investors' funds, the Investment Guide provides as follows:

THIS OFFERING WILL TERMINATE, AND INVESTORS' FUNDS WILL BE RETURNED TO THEM WITH INTEREST, IF SUBSCRIPTIONS FOR AT LEAST TWELVE (12) CLASS A UNITS HAVE NOT BEEN ACCEPTED ON OR BEFORE FEBRUARY 28, 2006, WHICH DATE MAY BE EXTENDED FOR UP TO FOUR MONTHS IN THE DISCRETION OF THE BOARD OF MANAGERS. THE COMPANY WILL RECEIVE ALL INTEREST EARNED PRIOR TO CLOSING ON SUBSCRIPTION FUNDS CONTRIBUTED BY

---

[1] The Subscription Agreement between Scott and RPP provided for a price of $125,000 per Unit based upon a handwritten change to the agreement initialed by both parties.

3

INVESTORS WHO BECOME MEMBERS.

See Investment Guide pg. 4. The Terms of the Offering further provide as follows:

> Resource Pointe Partners, LLC, a Virginia limited liability company (the "Company"), will offer up to 20 Class A membership interests ("Class A Units") to Accredited Investors (referred to herein either as the "Prospective Members" or "Investors"). Each Unit will require a contribution of $125,000 to the capital of the Company. The total capital contribution must be made in cash upon admission to the Company. The Company reserves the right to accept subscriptions for fractional Class A units.
>
> . . .
>
> The cash contribution of each Investor will be placed in a commercial bank. The initial closing of this Offering and the acceptance of subscriptions for Class A Units are contingent upon the sale of at least 12 Class A Units offered hereby for an aggregate purchase price of at least $1,500,000.[2] . . . This Offering will terminate, and Investors' funds will be returned to them with interest, if subscriptions for 12 Class A Units have not been accepted on or before February 28, 2006, which date may be extended for up to four months in the discretion of the Board of Managers. . . . Payments tendered by Prospective Members in payment of their capital contribution should be sent by wire according to the instructions which appear below. If subscriptions of any Prospective Members are rejected, their subscription funds (plus interest earned on their subscription funds for the periods such funds are held at a commercial bank) and their subscription materials will be returned to them).

See Investment Guide pgs. 7-8. The wire instructions provide that funds should be wired to

Resource Pointe Partners, LLC c/o Bridgewater Pointe Partners, LLC at BB&T and give contact

information for the BB&T branch in Roanoke, Virginia listing Michael E. Horan or Amanda

Minton as the appropriate contact persons.

RPP obtained a total of only $885,000 in subscriptions, including those of the plaintiffs,

less than the minimum required under either the Investment Guide or the Subscription

---

[2] This figure is in conflict with the 15 Unit requirement stated in the Subscription Agreements. The conflict is not relevant to the court's consideration of this matter, however, as the parties do not dispute that RPP sold fewer Units than required under either document.

4

Agreements. Nevertheless, BB&T has failed to return the funds paid by the plaintiffs under their respective Subscription Agreements. BPP filed for bankruptcy protection on or about April 16, 2008. The plaintiffs originally filed this action in the Circuit Court for the City of Richmond on May 19, 2008. The matter was then removed to the district court for the Eastern District of Virginia on June 9, 2008. On September 18, 2008, Judge James Spencer transferred the case to this court, granting the defendant's motion to transfer case and change venue. In his order, Judge Spencer cited BPP's bankruptcy proceedings, which are now ongoing in the Western District of Virginia, and the fact that the account which is in dispute is claimed by BPP as part of its bankruptcy estate.[3]

The defendant filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) prior to the transfer to this court, however, Judge Spencer declined to rule on that motion given the change in venue. The plaintiffs have now filed a motion to amend the complaint, attempting to address some of the points raised by the defendant in its motion to dismiss. The parties have fully briefed both motions and appeared before the court to present their arguments. Therefore, the parties' motions are now ripe for review.

## STANDARDS OF REVIEW

### I. Motion to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that a party may amend its pleading

---

[3] According to counsel for the defendant, the account to which the plaintiffs wired their funds was the BPP operating account with BB&T. This is confirmed in the declaration of Michael E. Horan which was filed as Exhibit C to the defendant's Memorandum in Opposition to the Plaintiff's Motion to Remand to State Court and/or to Abstain which was filed in the Eastern District of Virginia prior to the matter's transfer to this court. The plaintiffs note that the pleadings do not indicate what type of account was involved and that this should not be considered for purposes of the defendant's motion to dismiss. The court finds that the type of account is not relevant in deciding this matter given that the pertinent issue is the plaintiffs' status in relation to the account at issue.

5

with leave of court, which shall be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). Nevertheless, a court may deny a request for leave to amend "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 446 (4ᵗʰ Cir. 2001). In this case, BB&T argues that the plaintiffs' proposed amendment would be futile because, regardless of the amendment, the complaint fails to state a claim on which relief may be granted.

## II.    Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim upon the motion of the defendant for failure to state a claim upon which relief may be granted. When considering a motion to dismiss pursuant to Rule 12(b)(6), the court "should accept as true all well-pleaded allegations" and should construe those allegations in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4ᵗʰ Cir. 1993). As the Supreme Court recently noted, a complaint need not assert detailed factual allegations, but must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007). Furthermore, even assuming the factual allegations in the complaint are true, they "must be enough to raise a right to relief above the speculative level." 127 S. Ct. at 1965.

## DISCUSSION

In their complaint, the plaintiffs allege that BB&T breached its contractual duty as an escrow agent under the Subscription Agreements and the Investment Guide. Specifically, the plaintiffs claim that BB&T breached its contractual duties by (1) releasing their investments to

6

RPP prior to the conditions precedent of the terms of the escrow being met, i.e. RPP obtaining subscriptions totaling at least $1,500,000, and (2) failing to return their investments once it became clear that RPP had failed to obtain sufficient subscriptions by February 28, 2006, or in any event by no later than June 30, 2006. The plaintiffs also claim that BB&T breached its fiduciary duties as the escrow agent in possession of their investments by maliciously and with conscious disregard of plaintiffs' rights releasing their investments to RPP prior to RPP obtaining sufficient subscriptions and failing to return their investments once RPP actually failed to obtain sufficient subscriptions.

In its motion to dismiss, BB&T contends, in part, that the plaintiffs have failed to allege that BB&T agreed to be bound as an escrow agent under the terms of the investment documents entered into between the plaintiffs and RPP. In an effort to address this argument, the plaintiffs have now requested the court to permit them to amend their complaint to add the following language:

> 17.  At all relevant times (including at the time it received Plaintiffs' escrow funds, Defendant was aware of the existence and/or execution of the Subscription Agreements and Investment Guide and/or was aware of the conditions precedent (and other escrow terms) pursuant to which Plaintiffs deposited their escrow funds with Defendant. Defendant's acceptance of Plaintiffs' escrow funds, with knowledge and acceptance of the conditions precedent subject to their release, created escrow duties owed by Defendant to Plaintiffs.

The defendant argues, however, that, even considering this amendment, the plaintiffs' complaint fails to state a claim for which relief may be granted. As set forth below, the court also concludes that all of the plaintiffs' claims must fail as a matter of law.

## I.    Claims for Breach of Contract

BB&T first contends that the plaintiffs' breach of contract claims may not succeed

because it owes the plaintiffs, who are not customers of the bank, no contractual duties. The defendant also argues that it would have a duty of care to the plaintiffs as an escrow agent only if it had agreed to an actual escrow or deposit contract which set forth those duties. Therefore, according to BB&T, the proposed amendment alleging that BB&T was simply aware of the existence and/or execution of the Subscription Agreements and Investment Guide and/or of the conditions precedent included in those documents is not sufficient to form the basis for the plaintiffs' breach of contract claims.

In support of its arguments, the defendant first cites <u>United Virginia Bank v. E.L.B. Tank Construction, Inc.</u>, 226 Va. 551 (1984) in which the Virginia Supreme Court held that a depository institution owed a contractual duty only to the bank's customer, regardless of the source of the funds in the bank account. In that case, E.L.B. opened two bank accounts with United Virginia Bank, a general account and a payroll account, upon the recommendation of William W. Flippo, Jr., who had agreed through his company to cover certain expenses of E.L.B.. 226 Va. at 553. Signature cards filed with the bank indicated that only the owner of E.L.B. and the owner's wife could transact business for the account. <u>Id.</u> at 554. Flippo would transfer funds by telephone to E.L.B.'s general account for the payment of certain agreed operating expenses. <u>Id.</u> Checks written on the account were signed only by E.L.B.'s owner. <u>Id.</u> After a period of approximately two months, however, the bank transferred $8,000 from the E.L.B. general account to Flippo's account with the same bank, upon the oral order of Flippo and without the permission or knowledge of E.L.B. <u>Id.</u> After the bank refused to reimburse the E.L.B. general account, E.L.B. brought an action to recover its funds. <u>Id.</u> at 555. The bank claimed that it was authorized to withdraw the funds pursuant to a deposit contract between it

8

and Flippo which indicated that Flippo would have authority over the E.L.B accounts. Id.

The Court held that, even though Flippo had deposited funds into the E.L.B. account, "when one person makes a deposit of money to the credit of another, with the latter's consent, the latter person becomes the 'depositor' and a debtor-creditor relationship is created between the bank and the 'depositor.'" Id. As a result, such a depositor would become a customer as defined by U.C.C. § 8.4-104(e), and the bank would be "liable for any payment from that account not authorized by the customer." Id. The Court then went on to hold that only E.L.B., not Flippo, was the bank's customer with regard to the E.L.B. account and that the bank's action was improper. Id. at 556. Therefore, the case supports the proposition that a bank owes a duty of care only to its customer, not to non-customers such as the plaintiffs, even if the non-customers provided funds to the account.

BB&T also points to the case of <u>Collins v. First Union National Bank</u>, 272 Va. 744 (2006) in support of its argument that "a bank's acceptance of money from a third party is insufficient to support contract or tort claims by the third party." <u>See</u> Defendant's Response in Opposition to Motion for Leave to File Amended Complaint at B. In <u>Collins</u>, a group called InterBank engaged in a fraudulent scheme to entice foreign nationals to provide InterBank with sums ostensibly to take advantage of the EB-5 Investment Visa Program whereby such persons could obtain permanent resident status in the U.S. upon investing $500,000 in certain commercial enterprises. 272 Va. at 746-47. InterBank represented that such foreign nationals could invest only $100,000 to $150,000 plus a $20,000 processing fee and that it would supply the remainder through a loan. Id. at 747. The investors were informed that any funds supplied would be held in escrow until such time as their EB-5 Visa application was approved. Id.

9

InterBank contacted a vice president at First Union National Bank to set up deposit accounts for the scheme. Id. at 748. The vice president understood that InterBank was dealing with foreign nationals and expressed some concern with regard to any potential criminal activities, such as drug trafficking. Id. Representatives of InterBank provided the bank with a copy of an escrow agreement listing the bank as the escrow agent, however the bank informed InterBank that the bank would not set up an escrow account. Id. Instead, the parties decided to set up accounts under InterBank's name for the benefit of the particular investors. Id. The individual investors had no relationship with the bank and had no signatory power over the accounts which were set up by InterBank. Id. at 749.

After InterBank absconded with the funds deposited by the investors, the investors sued the bank, claiming that the bank owed them a duty of care as customers or as persons named in the FBO accounts, or in the alternative, as third party beneficiaries of the depository contract signed by the bank and InterBank. Id. The Court rejected the investors' theory that they were direct customers of the bank simply because InterBank had established the accounts with money beneficially belonging to another, noting that it had rejected just such an argument in E.L.B., supra. Id. at 750. Citing § 8.4-104(a)(5) of the Uniform Commercial Code, the Court found that a customer is one "having an account with a bank or for whom a bank has agreed to collect items," in this case only InterBank, regardless of the source of the funds in the account. Id. In fact, the Court also noted that, under E.L.B., "if the bank had recognized the investors' interest in the funds deposited to the FBO accounts and permitted the investors to withdraw them, it would have been liable in damages to its customer, InterBank." Id.

Finally, the Court held that the investors were not third party beneficiaries of the

10

depository agreement between InterBank and the bank, finding that there was no intention on the part of the contracting parties to confer a direct benefit upon the investors. Id. at 751. Instead, the Court noted that the bank's concern in rejecting the escrow account option and suggesting FBO accounts as an alternative was primarily directed toward protecting the bank from any connection with criminal activity. Id. The Court finally noted that the bank officer "refused to open escrow accounts, which would have imposed upon FUNB duties to the investors as well as to InterBank, and instead suggested FBO accounts, in which InterBank, the bank's sole customer, would have sole control of the funds on deposit." Id. See also, Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 227 (4th Cir. 2002) (holding that "a bank does not owe noncustomers a duty of care").

The plaintiffs respond that the cases cited by BB&T dealing with depository accounts and the potential claims of non-customers are inapposite to the present case where they allege that an escrow was created. The plaintiffs point to the language previously cited in Collins, supra, stating that the opening of an escrow account "would have imposed upon FUNB duties to the investors as well as to InterBank." 272 Va. at 751. In essence, the plaintiffs claim that the BB&T account involved in this case was an escrow account, at least with regard to their investments, in which the "Plaintiffs deposited the $750,000 in escrow funds with BB&T, not **'for the credit'** of RPP to be available for immediate withdrawal by RPP, but to be held by BB&T until such time as certain conditions precedent were met." See Plaintiffs' Reply in Support of Motion for Leave to Amend at 5 (emphasis in original).

Furthermore, the plaintiffs argue that no express escrow agreement is required to impose the duties of an escrow agent upon BB&T, citing Humphreys v. Richmond & Mecklenberg R.R.

11

Co., 88 Va. 431, 13 S.E. 985 (1891). In Humphreys, the Court examined a real estate transaction involving the transfer of a deed to property and held that "[w]hen a deed is delivered to a person to be held until certain conditions are performed, and then to be delivered to the grantee or obligee, it is an escrow; but the person to whom the deed is delivered in the first instance must be the judge as to when the condition is performed, in order to act. . . . The depository of an escrow is, in fact, the agent of both parties. As the agent of the grantor, it is his business to withhold the deed until the condition is performed; as the agent of grantee, it is his business to hold it for him, and to deliver it to him after the condition is performed." 13 S.E. at 993. The party to whom the deed was delivered in Humphreys, however, was the president of the railroad company defendant, had actual knowledge of the conditions precedent, agreed that he had held the paper in escrow, and was an attesting witness to the document signed by the plaintiff. Id. at 992-93.

In Winslow, Inc. v. Scaife, 219 Va. 997 (1979), another case involving the transfer of a deed for real property, the plaintiffs entered into a contract prepared by the attorney defendants to sell land to another party. The contract provided that the plaintiffs deliver the deed to the defendants "as settlement attorneys and escrow agents" for delivery to the third party upon the fulfillment of certain terms of the contract. 219 Va. at 999. Although the conditions of the contract were not complied with, the defendants nevertheless delivered the deed. Id. The Court held that "these allegations clearly set forth the existence of an escrow arrangement involving the plaintiffs as grantors, the defendants as compensated depositories, and the Minor company as grantee," citing Humphreys, supra. Id. at 1000. Therefore, "the breach by a depository of the terms of the escrow arrangement gives rise to a cause of action contractual in nature." Id.

The plaintiffs contend that, even though Winslow and Humphreys involved deeds for

12

property, the same principles are applicable to the instant situation. Therefore, according to the plaintiffs, BB&T acted in the capacity of an escrow agent when it accepted the plaintiffs' funds with knowledge of the terms of the Subscription Agreements and Investment Guide (as alleged in the amended complaint).

The court finds, however, that this case is distinguishable from those outlined in <u>Winslow</u> and <u>Humphreys</u>, <u>supra</u>. In <u>Winslow</u>, the alleged escrow agents had actually received compensation for acting in that capacity, as outlined in the real estate contract which they had prepared. In the instant case, by contrast, it is not alleged that the bank was involved in the preparation of the investment documents or that it received any compensation outside of regular bank fees from the defendant for holding the funds in the account. Neither is <u>Humphreys</u> applicable here. In that case, the alleged escrow agent actually admitted in his deposition that he had held the relevant document in escrow. 13 S.E. at 992. Furthermore, the Court ultimately determined that the evidence showed that this individual had agreed not to deliver the document to the railroad until certain conditions were met. <u>Id.</u> In the instant case, by contrast, the amended complaint alleges only that the defendant was aware of the terms outlined in the Subscription Agreements and Investment Guide. It is true that the plaintiff has also attempted to add language alleging that the defendant also accepted the terms of the escrow as stated in the investment documents as follows: "Defendant's acceptance of Plaintiffs' escrow funds, with knowledge and acceptance of the conditions precedent subject to their release, created escrow duties owed by Defendant to Plaintiffs." However, the court finds that this statement is merely a conclusion of law regarding the duties allegedly owed to the plaintiffs by the defendant and not a factual allegation. Therefore, the relevant issue is whether the plaintiffs have stated a claim for breach of

13

contract if BB&T simply knew about the conditions included in the Subscription Agreements and the Investment Guide.

In this case, in the amended complaint, the plaintiffs have alleged that, at the time it received their funds by wire transfer, BB&T had knowledge of the existence and/or execution of the relevant investment documents and/or was aware of the conditions precedent set forth therein. There are no allegations that the plaintiffs had any signatory power or other forms of control over the account. In fact, unlike the accounts at issue in the Collins case, the account at issue here did not include the names of the plaintiffs in any capacity. Nor is there any allegation in the amended complaint that the account was established as an escrow account. As stated in E.L.B., and confirmed by the Court in Collins, simply wiring funds to an account is not sufficient to render the sender of those funds the customer of the bank. Therefore, the court first concludes that the plaintiffs were not customers of BB&T, and the bank owed them no duty in that capacity.

Furthermore, there is no allegation that the bank undertook to act as an escrow agent with regard to the funds wired to RPP in the care of BPP. The court agrees that it is not necessary for a bank to enter into a written escrow agreement to assume duties as an escrow agent. Nevertheless, there must be some form of express agreement to enter into an escrow arrangement. In both Humphreys and Winslow, the cases cited by the plaintiffs, the persons ultimately found to be escrow agents had accepted those duties by express agreement, whether oral or written. This is simply not the case here, even as alleged in the amended complaint. As recognized by the Virginia Supreme Court in Collins, supra, simply being aware of an escrow agreement between the bank's customer and third parties does not make the bank an escrow agent with regard to funds deposited by those third parties in the bank account of that customer.

14

Only the existence of an actual escrow account or agreement would have imposed duties to the investors upon the bank. The situation here is virtually identical.

This result is further dictated by the shambles the success of the plaintiffs' arguments would create of the banking industry. Under the plaintiffs' theory, a bank would assume escrow duties automatically whenever it might become aware that its customer and a third party had entered into some sort of arrangement that included an escrow agreement. The court believes that it would simply be unworkable for a bank to monitor its customers' accounts, in the absence of an agreement, to determine whether certain conditions precedent in contracts to which the bank was not a party had or had not been met before permitting its customers to transfer or withdraw funds from accounts over which those customers possessed sole control. Such accounts could include regular business checking accounts which would experience a significant volume of transactions. The plaintiffs suggest that the bank should automatically set up segregated escrow accounts with the funds deposited by third parties which would be segregated from other bank accounts if it learned of particular escrow arrangements involving its customers and these third parties. But this argument ignores the fact that the bank would not have agreed to assume the duties of an escrow agent with regard to such funds, would not be compensated for these responsibilities, and, in the absence of some agreement on the part of the bank with its customer, would have no easy way to monitor the fulfillment of the conditions precedent. The appropriate way to address this situation would be for the bank's customer to set up an escrow account with the bank whereby funds are specifically segregated and the bank formally assumes the duties of an escrow agent. This was not done here. As a result, the court holds that BB&T did not breach any contractual duties to the plaintiffs, either stemming from the Subscription

15

Agreements and the Investment Guide or otherwise, and the plaintiffs' claims for breach of contract must be dismissed.

## II.    Claims for Breach of Fiduciary Duty

With regard to the plaintiffs' claims for breach of fiduciary duty, the defendant contends that the complaint fails to set forth a claim for breach of fiduciary duty that is independent from the cause of action for breach of contract. See Vanguard Military Equip. Corp. v. David B. Finestone Co., Inc., 6 F. Supp. 2d 488, 492 (E.D. Va. 1997) (holding that "the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract") (quoting Foreign Mission Board v. Wade, 242 Va. 234, 409 S.E.2d 144, 148 (1991)). Because the plaintiffs rely upon the Subscription Agreements and the Investment Guide to set forth the duty they claim the defendant has breached, BB&T argues that all of their claims stem from these contractual documents and have no other independent basis. Therefore, BB&T maintains that these claims must be dismissed.

As the plaintiffs note, the Court in Vanguard, supra, also held that the same facts supporting a claim for breach of contract may support a tortious breach of fiduciary duty claim as well, so long as the latter duty arises out of the common law rather than the contract. 6 F. Supp. 2d at 493. The plaintiffs contend that, when BB&T accepted their funds to be held in escrow, an escrow arrangement arose between the plaintiffs, RPP, and BB&T. Therefore, based upon this allegedly direct relationship, the plaintiffs maintain that they placed a special confidence in the bank to hold their funds until the specific condition precedent had been met.

As previously stated, however, the court has held that the acceptance of the plaintiffs' funds alone, in the absence of an express escrow agreement to which the bank was a party, is not

16

sufficient to render the plaintiffs the defendant's customers or to create any duties on the part of BB&T which would flow to the plaintiffs. In this case, BB&T's duties were only to its customer, regardless of the independent obligations of the customer to the plaintiff investors. As a result, the court concludes that the defendant had no duty to the plaintiffs under the common law, and the plaintiffs' claims for breach of fiduciary duty must also be dismissed.

## CONCLUSION

The court has determined that the plaintiffs' complaint fails to state a claim for which relief may be granted even when considering the additional language in the plaintiffs' proposed amended complaint. Therefore, although the court finds that the plaintiffs' proposed amendment would not be prejudicial to the defendant and that there has been no bad faith on the part of the plaintiffs, the motion to amend the complaint will nevertheless be dismissed on the basis of futility.

The Clerk is hereby directed to send certified copies of this Memorandum Opinion and the accompanying Order to all counsel of record.

ENTER:       This 5th day of December, 2008.


_____
United States District Judge

17